# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br><br>**vs.**<br><br>**KEVIN SHARKEY,**<br><br>**Defendant.** | **3:22-CR-30045-RAL**<br><br><br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS** |

In this aggravated child sexual abuse case, Kevin Sharkey (Sharkey) moves to suppress statements he made in a post-polygraph interview. Sharkey maintains that he was in custody and interrogated during the interview and that he was coerced into waiving his rights by deception and trickery. He also posits that the same chicanery made his statements involuntary under the Fifth Amendment. Because agents conducted a noncustodial interview, notified Sharkey of his rights, and he waived them, the Court recommends that the suppression motion be denied.

## BACKGROUND

In March 2022, the FBI investigated reports of Sharkey engaging in sexual contact with M.S.B., a female child under 12 years old. Special Agent Michael Lemmage

(Lemmage) met with Sharkey on March 7, at Sharkey's place of employment in Valentine, Nebraska.  In this audio-recorded encounter, Lemmage informed Sharkey that he was not in custody, that he could answer questions if he wanted to, and that if he did not, he could stop the questioning at any time.  Lemmage began by asking about Sharkey's familiarity with M.S.B. and another child, both of whom lived at Sharkey's house for "about two or three months" after their mother passed away and their father went to prison.[1]  Lemmage told Sharkey he was following up on reports of some "inappropriate sexual things going on," including improper touching and pornography exposure, while the children lived with him.[2]

When confronted with the allegations, Sharkey repeatedly denied he exposed the children to pornography or touched them in an unacceptable manner.  Agent Lemmage asked if Sharkey would "be interested in taking . . . a polygraph" and Sharkey said he would, "guarantee[ing] that none of that happened."[3]

They conferred about a time for the polygraph and decided that the evening, after Sharkey finished work, would be most convenient.  Agent Lemmage advised Sharkey it

---

[1] Mot. Hr'g Ex. 2 at 02:37-04:40 (Mar. 9, 2023).

[2] *Id.* at 10:06-10:21.

[3] *Id.* at 16:56-17:37.

would likely take place at a police department in Rosebud or Valentine, and the two parted ways.

Agent Lemmage and Sharkey scheduled the polygraph examination for nine days later, 6:30 p.m. on March 16, at the Rosebud Police Department. Sharkey arrived at the appointed time and met with Elbert Andress, a special agent for the state Division of Criminal Investigation (DCI) and a licensed polygrapher, in an office at the department. Before administering the test, Andress explained the process and what Sharkey's rights were. Sharkey then read aloud, signed, and wrote the time on a DCI polygraph authorization form that enumerated his rights in detail.

During the polygraph, which consisted of a series of "segments" asking slight variations of the same questions, Sharkey denied having sexual contact with M.S.B. The test results showed deception. Agent Andress told Sharkey about his poor performance on the test and proceeded to question him. Sharkey eventually admitted to one instance of touching M.S.B. on her vagina, underneath the clothes, while she was lying in bed and sleeping (or so he thought). Sharkey also said he was drunk. Andress quizzed Sharkey further about the contact, and eventually traced Sharkey's hand on a piece of paper. Sharkey drew a line on the hand tracing to show how much of his finger penetrated M.S.B.

Toward the end of the interview, Sharkey agreed that Agent Lemmage could join. Sharkey recounted the M.S.B. incident to Lemmage, who probed Sharkey for admissions

to other potential sexual contacts.  Sharkey denied remembering anything else and, after a few minutes, asked if he could go home.  Agent Andress continued with a few more questions, wanting to know whether there was "anything else you can think of that somebody might come forward and tell us down the road, or tell Mike?"[4]  Sharkey did not confess to anything more, but did, when requested, sign the diagram of his traced hand and the mark he made on it.  All tolled, Sharkey spent about 2 hours and 40 minutes with agents.  He left on his own that night (his wife picked him up) and was not arrested.

Two months later, a federal grand jury indicted Sharkey, charging him with aggravated sexual abuse of a child.[5]  He moved to suppress the March 16 statements he made after completing the polygraph.[6]  The Court held an evidentiary hearing on the motion, heard testimony from Agents Lemmage and Andress, and received 14 exhibits into evidence.[7]  At that hearing, the Court also considered exhaustive testimony from Gregory DeClue, Ph.D. (DeClue), a forensic psychologist, about Sharkey's confession and agents' tactics during his interviews and the polygraph.[8]

---

[4] Mot. Hr'g Ex. 7 at 02:36:17-02:36:25.

[5] Docket No. 1.

[6] Docket No. 39.

[7] Docket No. 53.

[8] *Id.*; Mot. Hr'g Tr. 98-192 (Mar. 9, 2023).

## DISCUSSION

### A. Custody

Sharkey claims that the statements he made during his post-polygraph interview should be suppressed because he was in custody and any waiver of his Fifth Amendment right to remain silent was not done knowingly, voluntarily, or intelligently. He was not free to leave during the questioning, Sharkey says, because agents kept questioning him after he said, "Can I go home now? I've told you what I know. I want to go home."[9]

*Miranda* requires that law enforcement officers provide certain warnings before they conduct an interrogation of a suspect who is in custody.[10] Officers need not administer *Miranda* warnings to everyone they question.[11] Instead, "warnings are required only where there has been such a restriction on a person's freedom to render him 'in custody.'"[12]

"Custody" is a "term of art" that describes circumstances generally thought "to present a serious danger of coercion."[13] The central issue in the custody determination "is simply whether there [was] a formal arrest or restraint on freedom of movement of

---

[9] Mot. Hr'g Ex. 7 at 02:34:14-02:34:46; Docket No. 40 at 2-3.

[10] *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

[11] *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

[12] *Id*.

[13] *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).

the degree associated with a formal arrest."[14]  "Two discrete inquiries are essential to this determination:  first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he . . . was not at liberty to terminate the interrogation and leave."[15]

"[T]he critical [question] is not whether the interview took place in a coercive or police dominated environment, but rather, whether the [suspect's] 'freedom to depart was restricted in any way.'"[16]  When gauging the suspect's freedom of movement, a court must examine "all of the circumstances surrounding the interrogation."[17]  "Relevant factors" include, but are limited to, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of [the suspect] at the end of the questioning."[18]

---

[14] *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotation omitted).

[15] *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (*quoting Thompson* and emphasizing the custody determination has "two discrete inquiries").

[16] *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting *Mathiason*, 429 U.S. at 495).

[17] *Howes*, 565 U.S. at 509 (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam)).

[18] *Howes*, 565 U.S. at 509 (citations omitted).

The Eighth Circuit has set forth several common "indicia" which tend to either mitigate or aggravate an atmosphere of custodial interrogation.[19]  These indicia, while instructive, are not dispositive or exhaustive.[20]  They are merely one way to determine whether the suspect's movement was curtailed, as though he was under formal arrest, and subjected to the same inherently coercive pressures as the station house questioning at issue in *Miranda*.[21]

Sharkey was not in custody for purposes of *Miranda* as is evident from the following:

1.   Sharkey consented to taking the polygraph and scheduled it at his convenience.  Agent Lemmage proposed the polygraph to Sharkey on March 7 as a way to "clear this up" if Sharkey was "interested."[22]  Lemmage suggested it would take place at either the Rosebud or Valentine police station, whichever would be "eas[iest]" for Sharkey, in the evening on a "good day[] that would work" for him.[23]  Sharkey gave Lemmage his phone number to set a time and decide on a place for the polygraph.[24]  Ultimately,

---

[19] *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

[20] *See id.*; *see also United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011) ("the list is decidedly non-exhaustive"); *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005) ("the indicia . . . are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract"); *United States v. Czichary*, 378 F.3d 822, 827 (8th Cir. 2004) (no requirement that the indicia be used in every *Miranda* custody case).

[21] *See Howes*, 565 U.S. at 509.

[22] Mot. Hr'g Ex. 2 at 00:16:56-00:17:32.

[23] *Id.* at 00:17:37-00:18:59.

[24] *Id.* at 00:18:59-00:19:23.

they agreed to meet the evening of March 16 at the police department in Rosebud.[25]

2.    Sharkey arrived at the police department for the polygraph. His wife (not law enforcement) transported him to and from the department, a distance of 44 miles each way.[26]

3.    Sharkey could, and did, move freely about while with agents. He met with them in two different sized offices, one larger than the other, at the police department.[27] The doors in both offices remained unlocked from the inside. So Sharkey could have left either office at any time.[28] After finishing the polygraph, Agent Andress invited Sharkey to return to the first office, and Sharkey did so on his own.[29]

4.    Agents advised Sharkey of his rights and told him he was not in custody. Before making any statements, Sharkey read aloud and signed a polygraph authorization form, acknowledging that he was free to leave, that he could stop questioning and terminate the interview at any time, that he could remain silent and decline to answer any questions, that anything he said could be used as evidence against him, that he could consult and have an attorney present, and that, if he could not afford an attorney, he could have

---

[25] *See* Mot. Hr'g Tr. 20 (stating that Agent Lemmage and Sharkey "mutually" decided polygraph examination would take place in Rosebud and that Sharkey lived close to town of Rosebud).

[26] *See* Mot. Hr'g Ex. 7 at 02:39:05-02:39:28.

[27] Mot. Hr'g Tr. 24, 45-46.

[28] *Id.* at 55-56.

[29] *Id.* at 75-78; Mot. Hr'g Ex. 7 at 01:35:10-01:37:08 (where, after the polygraph was over, Agent Andress said to Sharkey, "Ah, we'll run back to that other room where it's a little bit comfier, all right? Grab your water and stuff if you want your belongings. If you want to head towards that room we were in, let me double check a couple of things.").

one appointed for him.[30]   Agent Andress asked if Sharkey had any questions or concerns about his rights, and Sharkey said, "No."[31]

5.    Sharkey took the initiative to attend the polygraph and answer the questions posed to him.[32]  In the pre-polygraph portion of the interview, Agent Andress asked Sharkey to explain "in just a couple of words, why [you are] here today," and Sharkey admitted he "volunteered" for it.[33] Sharkey continued to answer questions even after he said he wanted to go home.[34]

6.    Sharkey contemplated his right to refuse the polygraph.  He admitted that the night before the polygraph, he "wanted to call [Agent Lemmage] . . . and say 'Hey, cancel the polygraph,'" but decided to go through with it out of concern that Lemmage would "probably come pull [him] out of [his] work."[35]

7.    Sharkey's 2 hour and 40-minute get-together with agents was not long enough to render him in custody.[36]

---

[30] Mot. Hr'g Ex. 5; Mot. Hr'g Ex. 7 at 00:09:39-00:12:00; Mot. Hr'g Tr. 46, 130.

[31] Mot. Hr'g Ex. 7 at 00:12:00-00:12:15.

[32] *See Griffin*, 922 F.2d at 1349, 1351 ("this Court has frequently found custody lacking where suspects take the initiative to offer statements or voluntarily arrange for questioning").

[33] Mot. Hr'g Ex. 7 at 00:12:41-00:13:11.

[34] Mot. Hr'g Ex. 7 at 02:34:14-02:40:50; *United States v. Simpson*, 44 F.4th 1093, 1097 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 813 (2023) (finding no custody in post-polygraph interview where suspect answered fifty minutes of agent questions after repeatedly asking to go home).

[35] Mot. Hr'g Ex. 7 at 02:26:29-02:27:37.

[36] Mot. Hr'g Ex. 7; *see Yarborough v. Alvarado*, 541 U.S. 652, 664-65 (2004) (two-hour interview of suspect at police station non-custodial); *Simpson*, 44 F.4th at 1097 (5-hour and 50-minute polygraph and post-polygraph interview non-custodial).

8. The March 16 meeting was not police dominated. During the first 2 hours and 10 minutes, within which Sharkey made inculpatory statements, Agent Andress was the only other person in the room.[37]

9. Although he wore the polygraph components for a time, no one physically restrained Sharkey in a manner akin to a formal arrest.[38] He could have removed the components attached to his person at any time.[39] And nothing in the record suggests agents handcuffed him.[40]

10. Other statements agents made to Sharkey suggest he was not in custody. When Agent Andress stated that taking the polygraph was an "opportunity" for Sharkey,[41] it was just that – an opportunity, not an obligation or mandate.

11. Sharkey was 45 years old at the time, had an auto mechanics degree,[42] and did not exhibit any unusual intellectual deficit, mental impairment, or vulnerability.

---

[37] Mot. Hr'g Ex. 7 at 00:00:00-02:10:15.

[38] *See United States v. Thunder*, No. CR 11-30113-RAL, 2012 WL 5833542, at *6 (D.S.D. Oct. 22, 2012), *R&R adopted*, No. CR 11-30113-RAL, 2012 WL 5834382 (D.S.D. Nov. 16, 2012) (no custody where polygraph took place in small room and equipment somewhat restricted defendant's freedom of movement).

[39] *See* Mot. Hr'g. Ex. 9.

[40] *See generally id.*; Mot. Hr'g Ex. 7.

[41] *See, e.g.*, Mot. Hr'g Ex. 7 at 00:02:29-00:03:26; 00:05:00-00:05:58.

[42] Docket No. 13 at 1-2.

12.    Agents did not brandish guns, use force, employ punishment, or otherwise threaten Sharkey.[43]  Agent Lemmage had his duty weapon covered and under his shirt.[44]

13.    Sharkey was not arrested until two months later, on May 19 (after he was indicted).[45]

Weighing the totality of the circumstances, a reasonable person in Sharkey's position would not have understood he was in custody while taking the polygraph or speaking to agents during the post-polygraph interview.  It follows then that agents did not need to warn Sharkey of his *Miranda* rights, but they did so anyway.  Because the precepts of *Miranda* were adhered to, Sharkey's attempt to suppress his March 16 statements – on custody grounds – must fail.

### B.  Waiver

Even if agents subjected Sharkey to custodial interrogation that day, he still knowingly, voluntarily, and intelligently waived his rights at the outset of his meeting with Agent Andress.  While recognizing that Andress gave him the prophylactic *Miranda* advisement, Sharkey nonetheless contends that agents "misled," "tricked," or

---

[43] Mot. Hr'g Tr. 23-24.

[44] *Id.*; *United States v. Galceran*, 301 F.3d 927, 930 (8th Cir. 2002) ("[A]lthough the officers had weapons, they 'did not adopt a threatening posture toward [the suspect], display their weapons or make a physical show of force during the questioning period.'").

[45] *See* Mot. Hr'g Ex. 7 at 02:40:37-02:40:50; Docket Nos. 1, 22; *LeBrun*, 363 F.3d at 722 (stating that "lack of arrest [is] a very important factor weighing against custody" (quoting *Galceran*, 301 F.3d at 931)).

deceptively "baited" him.[46]  Among other things, he points out that Andress did not say

he was a "DCI agent or that he was law enforcement," and told Sharkey "I'm here for

you" and "[t]his is a golden opportunity for you," causing Sharkey to unwittingly choose

to talk (and waive his rights).[47]

The *Miranda* waiver inquiry has "two dimensions":  the waiver must have been (1)

"voluntary in the sense that it was the product of a free and deliberate choice rather than

intimidation, coercion, or deception" and (2) made "with a full awareness of both the

nature of the right being abandoned and the consequences of the decision to abandon

it."[48]  Should a mental defect diminish the suspect's capacity to resist pressure, that defect

alone will not invalidate a *Miranda* waiver without evidence of police coercion.[49]  The

totality of the circumstances must be considered when determining whether a suspect's

waiver is valid.[50]

---

[46] Docket No. 40 at 4-5, 7.

[47] *Id.* at 4-6; Mot. Hr'g Ex. A at 11-12 (arguing further that Agent Andress who was not in uniform, deliberately misled Sharkey by stating he was not with FBI, and calling Andress's manner of conducting polygraph a "sham").

[48] *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (*quoting Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

[49] *See United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (citing *United States v. Makes Room For Them*, 49 F.3d 410, 415 (8th Cir. 1995)).

[50] *See Burbine*, 475 U.S. at 421.

Agents' conduct, Sharkey's characteristics, the degree of police coercion, length of

interrogation and its location, and other factors[51] show Sharkey's waiver was the product

of his free will:

1. Sharkey, in writing, expressly waived his rights.[52]    Before asking substantive questions, Agent Andress handed Sharkey a polygraph authorization form, with four paragraphs of rights, the DCI's seal as a watermark, a release to "Mike Lemmage FBI," and "SA Elbert Andress['s]" name at the bottom.[53]  Sharkey read its contents out loud, then signed, and wrote the time on the form, acknowledging he understood what it said.[54]

2. Sharkey's 2 hour and 40-minute sustained dialogue with Agents Andress and Lemmage – which he could have ended at any time – corroborates his choice to speak as a "course of conduct indicating waiver" of his rights.[55]

3. Sharkey did not appear particularly susceptible to undue influence.[56] Rather, his background and statements to agents show his robust thinking and ability to judge what was in his best interest.  He graduated from high school in 1995 and a technical college two years later (with an auto mechanics degree), was in good physical and mental health, and had some familiarity with the criminal justice system (having plead guilty to a DUI

---

[51] *See United States v. Daniels*, 775 F.3d 1001, 1004-05 (8th Cir. 2014) (enumerating nonexclusive factors for totality of circumstances analysis in *Miranda* waiver context).

[52] *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written . . . statement of waiver of the right to remain silent or the right to counsel is usually strong proof of validity of that waiver").

[53] Mot. Hr'g Ex. 5.

[54] Mot. Hr'g Ex. 7 at 00:09:39-00:12:15.

[55] *Berghuis*, 560 U.S. at 386.

[56] *See Simpson*, 44 F.4th at 1097-98 (no overborne will for post-polygraph interview confession when defendant an adult of average intelligence with associate's degree and extensive criminal history).

when he was 21).[57]  Sharkey described himself as someone who "think[s] the worst all the time about everything," and said as an ATV technician, he "always triple check[s] everything" out of fear something may go wrong.[58] He demonstrated aforethought when he pondered cancelling the polygraph and decided not to after predicting the ramifications of not showing up.[59]

4.    Sharkey mindfully chose what to disclose to agents and attempted to justify and downplay the severity of his conduct.   Sharkey insisted that he was drunk when the sexual contact occurred, that he never meant to harm M.S.B., and that he did not penetrate her or did so only slightly as the hand-trace diagram reflects.[60]  He also provided many details about what happened.[61]

---

[57] Docket No. 13.

[58] Mot. Hr'g Ex. 7 at 02:26:50-02:27:42.

[59] *See id.* at 02:26:29-02:27:37:

| SA Andress: | So since you told your wife last night [about the sexual contact with M.S.B.], why didn't you just come in and tell us that today? |
| Kevin Sharkey: | I wanted to.  I wanted to call [Agent Lemmage] at eight o'clock this morning and say, "Hey, cancel the polygraph," but I's scared. |
| SA Andress: | Yeah, but it probably feels like a weight off your shoulders, doesn't it? |
| Kevin Sharkey: | When I woke up this morning I was like, "When eight o'clock rolls around, I'm calling [Agent Lemmage] and I'm telling him to cancel it" . . . . And, I kept running through my mind like, "If I call [Lemmage] this morning, I tell him to cancel it, he's going to know something is up, and he'll probably come pull me out of my work."  I mean, I just think the worst all the time about everything. |

*Id.*

[60] Mot. Hr'g Ex. 7 at 02:18:52-02:19:43; 02:03:26-02:04:14; Mot. Hr'g Ex. 6.

[61] *See* Mot. Hr'g Ex. 7 at 02:02:15-02:05:52; *see also* Mot. Hr'g Tr. 184-86; Mot. Hr'g Ex. 4.

5.    Sharkey invoked his rights at the end of the post-polygraph interview, evincing a conscious choice to speak to agents – and awareness of his right not to – up to that point. Not until 2 hours and 34 minutes into the interview did he ask, "Can I go home now?"[62] Despite further questioning from agents afterward, Sharkey made no more incriminating statements.[63] That Sharkey eventually asserted his right to terminate the interview and leave shows he knew and understood his rights all along. And if his subsequent signing of the hand trace diagram was an inculpatory act, it was a course of conduct signifying waiver after an invocation.

6.    Agents did not deceive Sharkey about their identities or roles in the interview. Agent Andress admitted, at the start, that he worked not *for* the FBI but *with* the FBI.[64] Although Andress did not specifically tell Sharkey he was a DCI agent, he handed Sharkey an authorization form with a watermarked DCI seal in blue print, discharging the DCI from any liability, releasing the results of the exam to the FBI, and listing the polygrapher as "SA Elbert Andress."[65] It should have been obvious to Sharkey that Andress was a law enforcement officer for, or someone affiliated with, the DCI. Agents' plain-clothes attire also had little, if any, bearing on whether they deceived or overbore Sharkey's will.

7.    The Fifth Amendment permits some deceptive law enforcement tactics.[66] But Agents Andress and Lemmage did not go outside their bounds with their statements to Sharkey. They maintained a calm, collected demeanor

---

[62] Mot. Hr'g Ex. 7 at 02:34:14-02:34:46.

[63] *See* Mot. Hr'g Ex. 7 at 02:34:46-02:40:50.

[64] Mot. Hr'g Ex. 7 at 00:02:29-00:03:26.

[65] Mot. Hr'g Ex. 5.

[66] *See United States v. Little Hoop*, No. 3:19-CR-30121-RAL, 2020 WL 7310898, at *3 (D.S.D. Dec. 11, 2020) (agent tactics, such as making true or fictitious promises, deceiving the suspect, having a sympathetic attitude, raised voice, and other tactics do not render statement involuntary unless overall impact caused suspect's will to be overborne).

throughout the interview and did not raise their voices or display aggression.  Sharkey though takes issue with what agents said to him:[67]

a.  **"[O]ne of the ways we can kind of clear this up is . . . a polygraph."[68]** Sharkey suggests Agent Lemmage's remarks, nine days before the disputed interview, tricked him.[69]  But they were nothing less than honest and forthright declarations.  In a non-custodial contact at Sharkey's place of work, Lemmage asked Sharkey about taking a polygraph and Sharkey agreed to one.  Nothing Lemmage said to Sharkey on March 7 was indicative of trickery or deception.

b.  **"This is a golden opportunity for you."**  Indeed, as Agent Andress said (three times) before the test,[70] the polygraph is a "golden opportunity" for a truthful suspect to bolster his assertion that nothing happened. This statement came while Andress explained the polygraph procedure, how the polygraph worked, the formulation of questions, the expected duration, and Sharkey being free to leave.  In his discussion of the examination procedure, Andress made Sharkey aware that, if he lied, the testing equipment would detect his dishonesty.  The "golden opportunity" statement therefore cannot be objectively construed as deceptive.

c.  **"I'm here for you."**  Over the course of the interview, Agent Andress made this statement five times.[71]  Andress also said he was from Spearfish and drove to the police department for Sharkey (to administer the polygraph) – a true assertion.  Andress began the interview by building rapport with Sharkey and gave him the benefit of the doubt. Andress's statement was not beguiling and did not undermine

---

[67] Docket No. 40 at 5.

[68] Mot. Hr'g Ex. 3 at 16:56-17:32.

[69] Mot. Hr'g Tr. 186-87.

[70] Mot. Hr'g Ex. 7 at 00:02:29-00:03:26; 00:05:00-00:05:58.

[71] *Id.* at 00:02:29-00:03:26; 00:05:00-00:05:58; 01:10:16-01:10:54; 01:48:14-01:52:01; 02:09:02-02:09:21.

Sharkey's ability to resist divulging his secret or overbear his decision-making capacity.

d. **"[Y]ou didn't do well."**[72]  Sharkey argues Agent Andress failed to tell Sharkey the results of the polygraph or did not carefully grade the test.[73] But Andress scored each segment of the polygraph as he administered it.[74]  As Andress reviewed each chart, he could tell Sharkey was being deceptive[75] and after the test, Andress told Sharkey he "didn't do well."[76]

e. **"So [if] you don't help me get your side of the story out, what we end up doing is we go with [M.S.B.'s] side of the story because that's all we have because we know your story's not true, right?"**[77]  Sharkey says that this statement was false and a coercive threat to induce him to confess.[78]  More reasonably though, Agent Andress was expressing his disbelief to Sharkey that "nothing happened" after the test results showed deception.

8. The recollection Sharkey ultimately revealed and confessed to came to him at home and was not the fruit of agent coercion.  It appears Sharkey wanted to relieve himself of guilt and distress by getting what he remembered off his chest.  Upon learning he "didn't do well" on the polygraph, Sharkey related to agents the same narrative he told his wife the night before.[79]

---

[72] *Id.* at 01:37:49-01:38:03.

[73] Mot. Hr'g Ex. A at 9.

[74] Mot. Hr'g Tr. 74-75 (explaining how Agent Andress scored polygraph while administering it); Mot. Hr'g Ex. 7 at 00:31:17-01:37:08 (breaks between testing segments while Andress analyzed polygraph instrument readings).

[75] Mot. Hr'g Tr. 47; Mot. Hr'g Ex. 4.

[76] Mot. Hr'g Ex. 7 at 01:37:22-01:37:37.

[77] Mot. Hr'g Ex. 7 at 01:44:44-01:46:35.

[78] Mot. Hr'g Ex. A at 15.

[79] Mot. Hr'g Ex. 7 at 02:19:48-02:20:35.

Agents were not required to Mirandize Sharkey (because he was not in custody) but still did so. After they did, Sharkey knowingly, voluntarily, and intelligently waived his rights and spoke to agents. Little, if any, evidence shows coercive conduct on their part. Sharkey's waiver was valid and made of his own accord.

### C.  Voluntariness

Sharkey argues that even if he made his statements in a noncustodial context, they resulted from coercion and were involuntary under the Fifth Amendment.[80]  Whether Sharkey waived his rights under *Miranda* or the Fifth Amendment, the same analysis applies.[81]  So, if Sharkey's waiver was voluntary for *Miranda* purposes, then it was voluntary for purposes of the Fifth Amendment as well.[82]  "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities had adhered to the dictates of *Miranda* are rare."[83]  Because the totality of the circumstances establish that Sharkey knowingly, voluntarily, and intelligently waived his *Miranda* rights, his statements were also voluntary under the Fifth Amendment.

---

[80] Docket No. 40 at 6-8.

[81] *Makes Room For Them*, 49 F.3d at 414.

[82] *See id.*

[83] *Vinton*, 631 F.3d at 483-84 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984)).

### D. Credibility of the Expert

At the suppression hearing, Dr. DeClue testified as an expert for the defense. Before the hearing, DeClue prepared a 20-page report summarizing Sharkey's discovery file and – through legal and supposed psychological analysis – opined that agents procured a false confession from Sharkey.[84]  He believed agents conducted a "sham procedure" on March 16, tricking and deceiving Sharkey into participating in the polygraph and follow-up interview.[85]  DeClue also characterized Sharkey's confession as a "recovered memory fragment" that only existed because Agent Lemmage confronted Sharkey with allegations at his workplace on March 7.[86]  After carefully examining DeClue's written report and considering his testimony at length, the Court finds DeClue's characterizations untrustworthy and his conclusions largely irrelevant and unconvincing.

Because the Rules of Evidence do not apply to evidence or testimony received at suppression hearings,[87] the judge presiding "should receive the evidence and give it such weight as his judgment and experience counsel."[88]  During a suppression hearing, "[t]he

---

[84] Mot. Hr'g Ex. A at 19-20.

[85] *See id.*

[86] *See id.*

[87] *See* Fed. R. Evid. 104(a), 1101(d)(1).

[88] *United States v. Matlock*, 415 U.S. 164, 175 (1974).

assessment of a witness's credibility is [therefore] the province of the trial court" and, in its discretion, the court may reject, in whole or in part, testimony when exercising its gatekeeping function.[89]

The Court declines to rely on Dr. DeClue's testimony and report for these reasons:

1.    Dr. DeClue manufactured premises, omitted significant facts, and elicited favorable responses to support his own conclusions.

   a.    He wrote and testified that Agents Andress and Lemmage, in a "deceptive framework," engaged in "psychologically coercive procedures" to "deliberately misl[ead] and trick[ ] Sharkey into waiving his rights . . . ."[90]  Agents though did *not* engage in deception.  But even if they did, that deception did not rise to a prohibited level or overbear Sharkey's will.  The general lack of coercion surrounding both interviews contradicts almost all of DeClue's testimony and weighs heavily against his credibility.

   b.    Dr. DeClue claims expert status in matters of "interrogations and confessions, police psychology, [and] interviewing witnesses . . . ."[91]  His written report relied heavily on the fact that agents kept asking questions after Sharkey said, "I want to go home," because that fact "confirmed [the interview] was a sham."[92]  But DeClue conveniently left out that 2 hours and 34 minutes elapsed before Sharkey expressed his desire to go home and that he made no further damning statements afterward.[93]  It is misleading to suggest Sharkey

---

[89] *See United States v. Coney*, 456 F.3d 850, 860 (8th Cir. 2006) (citation omitted).

[90] Mot. Hr'g Ex. A at 12, 19-20; Mot. Hr'g Tr. 149-50.

[91] Mot. Hr'g Tr. 99-100.

[92] Mot. Hr'g Ex. A at 12.

[93] Mot. Hr'g Tr. 188-89.

invoked one of his *Miranda* rights without any reference to when – at the *end* of the interview – the invocation occurred.

c.     Dr. DeClue also failed to mention in his report that he relied on Sharkey's answers to six questions he asked in a Zoom-based evaluation.[94]  Many questions were leading and suggestive of the answers DeClue sought and ultimately obtained.[95]

2.     Dr. DeClue provided inaccurate, self-contradicting, and otherwise unconvincing opinions.

a.     He eagerly offered legal opinions on waiver, voluntariness, false confessions, and polygraph procedures when he was not properly qualified to do so.[96]  And his legal opinion – that *Moran v. Burbine*'s waiver analysis applies to noncustodial meetings or conversations

---

[94] Mot. Hr'g Ex. A at 1; Mot. Hr'g Tr. 151.

[95] *See* Mot. Hr'g Tr. 151-153 (Q: "Did you feel like you were pushed into admitting something?" A: "Yes, definitely." Q: "Did you feel like you had no further choice other than to admit something?" A: "Yes, definitely. I felt like if I don't admit, he's going to cuff me and take me to prison right now." Q: "Did you feel like he wouldn't – would not stop questioning you until you admitted something?" A: "Oh, yes. He just kept pushing and pushing." Q: "Do you recall him telling you this is your golden opportunity?" A: "Yes." Q: "Did that make you feel that you would get some benefit if you admitted something?" A: "Yes." Q: "Do you remember the polygraph guy bringing up your own daughters?" A: "Yes." Q: "Did that contribute to you admitting something?" A: "Yes. He said something like, 'If this w[ere] your daughters, wouldn't you – something.'").

[96] Mot. Hr'g Tr. 99 (claiming his expertise in "forensic psychology" allows him to apply "the science and practice of psychology to matters of interest to the law.  That includes court cases as well as policy issues"), 104-05 (admitting he had never administered a polygraph nor taken part in a suspect interview, but had read, attended workshops, and taught a unit of an undergraduate psychology course addressing polygraphs), 156 (saying he is neither a lawyer nor a legal expert).

where *Miranda*'s prophylactic rules have not been triggered – goes against well-established law.[97]

b.  At the suppression hearing, Dr. DeClue often gave long and evasive answers to questions of counsel and the Court.[98]  In many of his answers, he tried to educate the Court on nebulous "science"-based generalities without relating them to Sharkey's case.[99]

c.  Dr. DeClue postulated that Agent Lemmage's encounter with Sharkey on March 7 had a coercive effect or somehow influenced Sharkey to submit to the polygraph and later confess.  DeClue believed Lemmage imposed a "trick" on Sharkey that permeated his intellect for nine days, causing him to "recover[ a] memory fragment" the night before the scheduled polygraph.[100]  But the recording of the March 7 conversation proves Lemmage did not force, threaten, or deceive Sharkey.  That Lemmage asked Sharkey about M.S.B., informed him of the allegations, and invited Sharkey to take the polygraph cannot be sincerely regarded as coercive or misleading.

d.  After concluding that Sharkey was about as "suggestib[le] as the average person,"[101] Dr. DeClue then cherry-picked facts to profess Sharkey was too gullible or naïve to discern that Agent Andress was a law enforcement agent.[102]  DeClue wrote that "Andress specifically told [Sharkey], 'I don't work with the FBI,' but did not tell [Sharkey]

---

[97] Mot. Hr'g Tr. 138; *Miranda*, 384 U.S. at 477-79; *see also United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) ("*Miranda* safeguards only apply to interrogation in a custodial setting." (citation omitted)).

[98] *See generally* Mot. Hr'g Tr. 98-192; *see, e.g.*, *id.* at 123-25, 158-59.

[99] *See, e.g.*, Mot. Hr'g Tr. 116-129.

[100] Mot. Hr'g Tr. 185-87; Mot. Hr'g Ex. A at 15.

[101] Mot. Hr'g Tr. 109-10; Mot. Hr'g Ex. A at 2-3.

[102] Mot. Hr'g Ex. A at 19-20.

that he [was], in fact, a Law Enforcement Officer."[103]  What Andress actually said was, "I don't work for the FBI; I work with them . . . . [Polygraphs] are the only thing I do for them."[104]  DeClue also omitted details about the authorization form Sharkey read aloud and signed, which had a DCI header and named "SA Elbert Andress" as the polygrapher.[105]  These details and others conflict with DeClue's speculative assertions.

e.    Dr. DeClue characterized Sharkey's minimizations – that he was drunk at the time and only slightly penetrated M.S.B. – as reasons why the "memory fragment" was possibly false, rather than as an excuse or rationalization for criminal conduct.[106]

f.    According to Dr. DeClue, it "appears likely that [Agent Andress] did not carefully score the polygraph results prior to engaging in an accusatory post-polygraph interview/interrogation . . ."[107] because only a minute passed between when the test ended and the post-examination interview began.[108]  But the evidence debunks this statement too.  Andress's testimony and the several minute pauses in the recording show he scored the polygraph as he administered it. [109]  When it was DeClue's turn on the witness stand, he walked back his testimony, admitting that he did not "know for sure whether [Andress] scored that or not."[110]

---

[103] Mot. Hr'g Ex. A at 7.

[104] Mot. Hr'g Ex. 7 at 00:02:29-00:03:26.

[105] Mot. Hr'g Ex. 5.

[106] Mot. Hr'g Tr. 172-75, 180-86.

[107] Mot. Hr'g Ex. A at 12.

[108] Mot. Hr'g Tr. 160-163.

[109] *See* Mot. Hr'g Ex. 7 at 00:31:17-01:37:08; Mot. Hr'g Tr. 75.

[110] Mot. Hr'g Tr. 160.

g.     The written report Dr. DeClue authored contains several timeline errors.  In his report, he declared that the polygraph occurred on March 18 (instead of March 16) and that March 17 was the date Sharkey remembered the M.S.B. incident and disclosed it to his wife (when the actual date was March 15).[111]

h.     Dr. DeClue emphasized that some details Sharkey provided about the incident with M.S.B. were "contradicted" by "independent evidence."[112] But any conflict or inconsistency there may be goes to the weight, not the admissibility, of Sharkey's statements and is for the jury to resolve at trial after considering all the evidence presented.

i.     Dr. DeClue gave little credence to Sharkey's express written and his implied "course of conduct" waivers.[113]

j.     Sharkey saw Dr. DeClue on November 28, 2022 (more than 8 months after the contested interview) and did so via Zoom, with Sharkey being in his attorney's office and DeClue presumably in his Florida office or home.[114]

k.     Other courts have rejected, limited, or excluded Dr. DeClue's testimony and opinions on confessions and police interrogation tactics.[115]

---

[111] Mot. Hr'g Ex. A at 7-10, 15, 19; Mot. Hr'g Tr. 178-80.

[112] *See* Mot. Hr'g Tr. 113-16 (testifying that, by his analysis, certain information that agents knew did not match up with Sharkey's confession, pointing out M.S.B.'s sleeping arrangements, that she was "developmentally delayed," and that she "actually wore diapers to bed"); Mot. Hr'g Ex. A at 3-11, 19 (stating, for example, Sharkey's confession was "CONTRADICTED by the fact that [M.S.B.] did not wear panties to bed, and that [M.S.B.] slept in [a] bunk bed[]").

[113] *See generally* Mot. Hr'g Ex. A.

[114] Mot. Hr'g Ex. A at 1.

[115] *See, e.g.*, *United States v. Dixon*, 261 F. App'x 800, 805 (5th Cir. 2008) (affirming district court's exclusion of DeClue's proffered testimony on false confessions because "Dr.

Dr. DeClue's psychological analysis and foray into the law, though somewhat persuasive if read in isolation, cannot be reconciled with the polygraph, interview recordings, and other hearing evidence. While the Court has addressed some of DeClue's contentions in its analysis above, it finds his opinions otherwise unworthy of additional discussion or consideration.

## CONCLUSION

Based on the totality of the circumstances, Sharkey engaged with Agents Andress and Lemmage in a noncustodial setting on March 16 when he submitted to a polygraph examination, failed it, and took part in a post-polygraph interview. Before they began the exam, Andress informed Sharkey of his rights, and Sharkey voluntarily chose to waive them and discuss the incident involving M.S.B. Because Sharkey's statements were

---

DeClue added nothing more than abstract scientific nostrums . . . . [that] did not apply recognized or accepted principles to [the defendant's] particular circumstances); *Soliz v. Davis*, No. 3:14-CV-4556-K, 2017 WL 3888817 (N.D. Tex Sept. 6, 2017) (Dr. DeClue's testimony properly not relied on); United *States v. Thill*, No. 4:21-cr-40120-KES, Docket No. 61, at 26 (D.S.D. Mar. 16, 2023) ("Contrary to Dr. DeClue's assessment, there is no evidence that [the agent] lied or manipulated [the defendant] to take the polygraph."); *State v. Chester*, 314 So. 3d 914, 960 (La. App. 2021) (excluding DeClue's proffered testimony because circumstances of interrogation, waiver of *Miranda* rights, content of questions, and reliability of defendant's statements are province of jury); *State v. Rice*, No. W2011-01069-CCA-R3-PD, 2013 WL 1229527, at *40, 42-43, 48 (Tenn. Crim. App. Mar. 27, 2013) (rejecting Dr. DeClue's opinions relating to defendant understanding his rights, validly waiving them, and making voluntary statements); *Collier v. State*, 857 So. 2d 943, 946 (Fla. Dist. Ct. App. 2003) (admissibility of Dr. DeClue's testimony reversed).

not obtained in violation of *Miranda* or the Fifth Amendment, they are admissible in the government's case-in-chief at trial.

## RECOMMENDATION

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that Sharkey's Motion to Suppress Evidence[116] be denied.

## NOTICE

The parties have 14 calendar days after service of this report and recommendation to object to the same.[117] Unless an extension of time for cause is later obtained,[118] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[119] Objections must "identify[] those issues on which further review is desired[.]"[120]

---

[116] Docket No. 39.

[117] *See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[118] *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[119] *See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[120] *Arn*, 474 U.S. at 155.

DATED this 31st day of March 2023.

BY THE COURT:

MARK A. MORENO
UNITED STATES MAGISTRATE JUDGE