UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KEVIN SHARKEY,<br><br>Defendant. | 3:22-CR-30045-RAL<br><br><br>OPINION AND ORDER DENYING<br>MOTION TO SUPPRESS |

A federal grand jury indicted Defendant Kevin Sharkey (Sharkey) on one count of Aggravated Sexual Abuse of a Child. Doc. 1. Sharkey moved to suppress the statements he made following a polygraph to South Dakota Department of Criminal Investigation (DCI) Supervisory Special Agent Elbert Andress (Andress) and FBI Special Agent Michael Lemmage (Lemmage) on March 16, 2022. Doc. 39. Magistrate Judge Mark A. Moreno issued a report recommending that Sharkey's motion to suppress be denied. Doc. 62. Sharkey now objects to the report and recommendation. Doc. 70. Having conducted a de novo review of the report and recommendation to which Sharkey objects, this Court adopts the report and recommendation.

## I.   Standard of Review

This Court reviews a report and recommendation under the statutory standards found in 28 U.S.C. § 636(b)(1), which provides in relevant part that "[a] judge of the [district] court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." However, when there is no objection, the district

court need not "give any more consideration to the magistrate's report than the court considers appropriate." Thomas v. Arn, 474 U.S. 140, 150 (1985).

## II.   Factual Background

On March 7, 2022, Lemmage met with Sharkey outside the mechanic shop where Sharkey worked in Valentine, Nebraska.  Doc. 55 at 1, 3.  During that interaction Lemmage informed Sharkey of allegations made by M.S.B. and another child that Sharkey inappropriately touched one of the children in the presence of the other and exposed them to pornography while the two children lived with Sharkey and his wife.  Id. at 2, 11.  After Sharkey denied the allegations, Lemmage asked if Sharkey would be interested in taking a polygraph, to which Sharkey agreed. Id. at 2, 14–16.  Lemmage then asked Sharkey what time would work best to conduct the polygraph.  Id. at 16.  Sharkey stated he would prefer a time after work, and from the context of the interview, though the audio recording of Sharkey's place preference is unintelligible, it appears Sharkey preferred the polygraph be conducted in Valentine.  Id. at 15–16.

Lemmage scheduled the polygraph examination for 6:30 p.m., March 16, 2022, at the tribal police station in Rosebud, South Dakota, nine days after the initial interaction between Lemmage and Sharkey.  Sharkey agreed to this time and location for the polygraph, and even expressed surprise that he was given the choice regarding scheduling.  See id. at 47 ("That's like Mike and, you know, 'When do you want to do it?' and I'm like, 'You're giving me the choice?'").  Sharkey's wife dropped him off at the Rosebud Police Station at the appointed time.  Id. at 26.  Both agents were in plain clothes, and Andress almost exclusively interacted with Sharkey until inviting Lemmage to join the post-polygraph interview.  Id. at 95.  Andress initially took Sharkey into a large office, at least 12 feet by 10 feet.  Doc. 60 at 24, 45; Doc. 56 at 43.  There were no windows

in the room, but it was near the rear exit of the police station. Doc. 60 at 24. Here, Andress made preliminary small talk, introductions, explained his role, and explained what Sharkey could expect:

> **00:02:29 SA ANDRESS:** So my job, Kevin, is a polygrapher, okay I don't have anything, I don't work for the FBI. I'm here for you. This is a golden opportunity for you. . . . We recently had some guys retire and move on to different jobs, so I'm actually out from Spearfish, South Dakota. I drove out here for you. This is a golden opportunity for you. I know very little about the investigation, and I don't care to. That's not my business, okay? I don't work for the FBI; I work with them. They asked me, and, you know, um, polygraphs are the only thing I do for them. When we're done you're walking out, I'm walking out, no matter what happens, and you'll probably never see me again, okay?
>
> . . . .
>
> . . . And, an accusation has been made, my understanding is you're saying nothing happened, okay? I've got no reason not to believe you that you're telling me the truth, okay? But this is something, about, you know, you've been straight up with Mike, "Hey, I'll cooperate. I'll do a polygraph," and it's something we can put on that side to say, "Hey, you know what? Kevin cooperated. He passed the polygraph," and uh, you know, so we can kind of put this thing to rest. It kind of reinforces in everybody's mind that, "Hey, nothing happened," okay? Um, so what's going to happen today is I'll kind of sit down and have you kind of explain to me, uh, your side of the story.

Doc. 55 at 27–28. The entire explanation above took place over about two minutes and thirty seconds. Id. (starting at 00:02:29 and ending at 00:04:58).

Andress then further explained the procedure for the polygraph, telling Sharkey that he will know all the questions, that multiple tests will be done, and that the room with the polygraph equipment is small. Id. at 29. Andress then told Sharkey "I'm here for you. I got no reason not to believe you today, uh, so this is a golden opportunity for you to, you know, put this on, your side saying, 'Hey, I passed.' And, and, I can already tell a little bit, Kevin, you're nervous." Id. Sharkey admitted that he was nervous and Andress then described measures taken to ensure that nervousness alone will not cause a person to fail a polygraph. Id. at 29–31. Andress then discussed

3

the time expected to complete the polygraph and alerted Sharkey that everything Andress did would be recorded. Id. at 31–32.

Andress then told Sharkey he had a form to fill out that was required by his department. Id. at 28, 32. The form reads as follows:

> I understand that I have the right to refuse a polygraph examination. I voluntarily agree to take this polygraph examination. I understand that I am free to leave or terminate the examination at any point. I understand the process of the examination will be explained and that all questions will be reviewed as needed prior to the examination. I understand that I may decline to answer any individual questions.

> I also understand that I have the right to remain silent and stop questioning at any time. I understand that anything I say can be used as evidence against me. I understand that I have the continuing right to consult with and have the presence of an attorney. I understand that if I cannot afford an attorney, an attorney will be appointed for me.

> On behalf of myself, my spouse, legal representatives, heirs, and assigns I hereby release, waive, discharge, and agree to hold harmless the Division of Criminal Investigation, its agents, cross-examiner, and employees from all liability for any claim or damages in connection with the test or the release of this information.

> I authorize the release of the results of this examination (s), recording (s), statements or conversations regarding this examination to the South Dakota Division of Criminal Investigation and the following person or agency: [Mike Lemmage, FBI].

Id. at 24, 33. The form has a water mark reading "Division of Criminal Investigation" and depicts a law enforcement badge, the state of South Dakota, and the United States flag. Id. at 24. The final line of the form reads "Polygraph Examiner: SA Elbert Andress License Number: 035." Id. at 24. Andress filled out the date, time, and agency authorization on the polygraph authorization form, which Sharkey then read aloud and signed. Id. at 24, 32–34. After reading the form, Sharkey said he had no questions or concerns. Id. at 33–34.

Andress then began the pre-polygraph interview. Id. at 34. When asked why he was there Sharkey stated he "volunteered for [the polygraph]." Id. Sharkey then told Andress that Lemmage

4

told him of accusations of sexual misconduct, and Sharkey gave information of when the two children were in his care, how long the children were in his care, where they were located, who was in the house at the time, how old the children were, and why they were in, and then left, Sharkey's care. Id. at 34–41. Sharkey also opined that the accusations of sexual touching by the child might stem from confusion about the name of the actual perpetrator. Id. at 41. Andress began to conclude the pre-polygraph interview by suggesting Sharkey take a short break and then move to the other room. Id. at 46. Sharkey then expressed his nervousness again and Andress asked a few additional questions about when the accusations were made and the current ages of the children, to which Sharkey replied he did not know. Id. at 46–48. Sharkey used the restroom while Andress went to ensure his equipment was properly set up. Id. at 48. Lemmage then escorted Sharkey from the bathroom to the second interview room. Id. at 49.

The second interview room, for ease the "polygraph room," is small. In this room was the polygraph equipment, normal office supplies, Sharkey, and Andress. Doc. 60 at 46. The door to the polygraph room was locked from the outside, but still could be opened from the interior. Doc. 55 at 71. Andress gathered Sharkey's identifying information, education level, medications, and medical conditions, before again explaining the process of the polygraph and hooking up Sharkey to the machine. Id. at 49–58. Andress then conducted a practice exam with Sharkey to ensure that everything was properly set up and he could properly read the data on his screens. Id. at 58–62; Doc. 60 at 74. Andress went over the questions with Sharkey and conducted the polygraph examination using those questions. Doc. 55 at 62–68. During the examination there were questions Andress referred to as "special questions," where the examinee is expected to lie. Id. at 59, 64. Sharkey stated that these "special questions" confused him and compared them to "brainteasers," and answered several of the "special questions" incorrectly. Id. at 64, 67, 69, 73,

76. Andress then conducted two more polygraph tests before concluding the polygraph and saying "Ah, we'll run back to that other room where it's a little bit comfier, all right?  Grab your water and stuff if you want your belongings.  If you want to head towards that room we were in, let me double check a couple of things."  Id. at 69–76.

When the polygraph ended, Sharkey had been at the police station for approximately 90 minutes.  Id. at 76.  Sharkey then left the polygraph room and re-entered the first office.  Andress and Sharkey sat down in chairs with the door in between them.  Doc. 56 at 43; Doc. 60 at 25. Andress informed Sharkey that he "didn't do well" on the polygraph.  Doc. 55 at 76.  Andress stated that Sharkey was being untruthful and encouraged Sharkey to be truthful or explain why the polygraph showed Sharkey was being dishonest.  Id. at 76–78.  Andress then told Sharkey:

> So I know something happened, but what happened?  Okay, so I want to be able to help go to Michael for, you know, with you and say, "Hey, you know what?  He said nothing happened, but this is what actually happened."  Let's be honest, let's be straight up about it, okay?  Let's own it, because the other thing is, I'm here for these young girls.

Id. at 78.  Andress made a comparison asking Sharkey what he would want to happen if his own daughters had been victimized and listed potential effects sexual abuse can have on victims.  Id. at 78–79.  Sharkey denied any intentional sexual contact and said if there was any sexual contact it was accidental.  Id. at 79–82.

After hearing the denials, Andress again confronted Sharkey saying:

> Okay, but, but what I'm saying is, you know, where did you touch her at?  'Cause you were thinking about something during the exam, Kevin.  You were thinking about a specific, as, you know, a specific occurrence because your body is showing me that, okay?  And so I want to be able to go to Mike and tell him. "Hey, here's what happened.  Here's, here's Kevin's version of the story," all right?  You know, "Here's his side of the story."  Because, here's what ends up happening otherwise. It's, we've got her story, we've got your story, and we now have a polygraph saying that he's not being truthful.  So you don't, help me get your side of the story out, what we end up doing is we go with her side of the story because that's all we have because we know your story's not true, right?  So what we want to do is get your

side of the story out, but I also, I'm here to help [M.S.B.] I want to help her put this behind her. I know you care about her, but that, you know what? I've done enough of these that I know people make mistakes sometimes. Don't let one incident define you, okay? You're a good person. I know that because of the results I'm getting. You know what happened shouldn't have, and your body is giving you up, okay? And, and so let's make the right decision and move forward to help [M.S.B.] deal with this so she isn't traumatized the rest of her life. 'Cause that's what ends up happening with these if they don't deal with it properly. It can affect them the rest of their life, okay? And in order to do that, I want, I, I need you to be honest with me.

Id. at 81–82. Sharkey continued to deny he had any intentional sexual contact with the alleged victim. Id. at 82–84.

Andress again accused Sharkey of lying to him saying:

And, and I'm just being straight up with you. I got no reason to lie to you. I've got no skin in the game in this case, okay? I'm here, you know I came down here to, to, to you know, get, let you take a polygraph so we could put that on your side to help you out, okay, but when I get done and it's saying that, no, something happened, okay? I'm still here for you. I want to get your side of the story out because, I'm not saying that her story is one hundred percent accurate, but I know yours isn't, okay? I know for a fact there's more to your side of the story. So how do we, you know, I want to be able to help you get your side of the story out to Mike, okay? So let's talk about it. What happened between you and [M.S.B.] that's bugging you? 'Cause it's probably been weighing on you since it happened, hasn't it? Like a backpack full of bricks.

Id. at 85–86. At this point, Sharkey began to talk about his heavy drinking and stressful job at the time when the children lived with him. Id. at 86–87. Sharkey then asked if he was going to be taken "straight to jail" and Andress responded "No, you're walking out of here tonight." Id. at 87–88. About five and a half minutes later, after Andress repeatedly asked "what happened" or a variation thereof, Sharkey said that he remembered "coming to" while sitting on the children's bed with his finger on M.S.B.'s vagina. Id. at 90. About half an hour had passed since Andress and Sharkey had concluded the polygraph. Sharkey then drew a diagram showing a small portion of his finger had been inside M.S.B. Id. at 25, 91.

7

Sharkey denied performing oral sex or any other sexual act on the child after several prompts from Andress. Id. at 91–93. Andress then invited Lemmage back into the interview room. Id. at 93–95. Lemmage sat between Sharkey and Andress, facing but not blocking the door. Doc. 56 at 43; Doc. 60 at 25. Sharkey then recounted the same statements to Lemmage. Doc. 55 at 95–96. Lemmage asked what else Sharkey remembered and Sharkey said that was all he remembered. Id. at 97. Sharkey denied showing the children pornography, saying any pornography they would have seen was by mistake on the television, and repeated denials of doing any other sexual act with the children.  Id. at 98–102.  Sharkey continued to deny any other allegations and when prompted to be truthful, said "I am." Id. at 106–07. After further interrogation from Lemmage and Andress, stating that the children alleged more misconduct, Sharkey denied anything further and reaffirmed that he  told Andress and Lemmage everything he knows.  Sharkey then asked questions about what will happen to him. Id. at 107–11.

About half an hour after the initial disclosure, Sharkey told the agents he wanted to go home. Id. at 111. Andress asked if any other allegations will come to light from other people, which Sharkey denied. Id. at 111–13. Sharkey then signed the tracing of his hand at the request of Andress. Id. at 113. Sharkey gathered his belongings, ensured his ride was at the station, and left. Id. at 113–15. From the time Sharkey stated he wanted to go home to the time he left the police station, six and a half minutes passed, though only four minutes passed from the time Sharkey indicated he wanted to go home to when the three men stopped talking about the allegations. Id. at 111–15.

Two months later, a federal grand jury indicted Sharkey on charges of aggravated sexual abuse of a child. Doc. 1. Sharkey moved to suppress the statements he made after the March 16, 2022 polygraph. Doc. 39. Magistrate Judge Moreno held a hearing and considered testimony

8

from Dr. Gregory DeClue (DeClue). Doc. 53. DeClue evaluated Sharkey and found that Sharkey "showed about as much suggestibility as the average person does." Doc. 56 at 3. After presenting an inaccurate timeline,[1] DeClue concluded that the polygraph conducted by Andress "was a shame [sic] procedure and Mr. Sharkey was tricked into waiving his rights and getting himself entangled in this sham procedure." Id. at 12.

> DeClue believed that any statement given was unfair and involuntary because:
>
> Investigators deliberately misled and tricked Mr. Sharkey into waving his rights by, apparently deliberately, misleading him about the fact that Supervisory Special Agent Elbert Andress is a law-enforcement officer. Supervisory Special Agent Elbert Andress told Mr. Sharkey that he was there to help Mr. Sharkey, played human lie detector, and falsely threatened to go with the accuser's story if Mr. Sharkey would not tell a confession story (even though, at that time, there likely was not probable cause for arrest). Both investigators continued to interrogate Mr. Sharkey after Mr. Sharkey clearly said he wanted to stop and go home, revealing that Mr. Sharkey was not actually free to leave until whatever time the investigators decided to allow him to leave. These psychologically coercive procedures directly caused Mr. Sharkey to agree to undergo what turned out to be a sham procedure, and to tell them about the possible memory fragment that had occurred to him on the previous evening.

Id. at 19–20. DeClue's report, as well as his testimony, contain various legal citations, including to Miller v. Fenton, 474 U.S. 104 (1985) (Issues Relevant to Fairness and Voluntariness), and Colorado v. Spring, 479 U.S. 564 (1987) (Issues Relevant to Waiver of Rights), in his report, Doc. 56 at 12, and Moran v. Burbine, 475 U.S. 412 (1986), in his testimony, Doc. 60 at 122 ("I'm not a lawyer . . . [b]ut my understanding based on my knowledge, training, and experience as a forensic psychologist is that, as stated in Moran v. Burbine that the—there's a two-step process."). During

---

[1] The error in DeClue's timeline was a minor but consistent typographical error listing the wrong date for the polygraph conducted by Andress as taking place March 18, when it actually took place on March 16. Doc. 55 at 24, 26; Doc. 56 at 7–11.

the hearing, DeClue revealed that he asked Sharkey a list of six undisclosed, mostly leading questions on which he based his opinions in part.[2] Doc. 60 at 151.

Shortly after the hearing, Judge Moreno issued a report and recommendation that Sharkey's motion be denied and finding the expert presented at the hearing was largely irrelevant and

---

[2] The six questions and answers included:

> [DeClue]:  So six questions:
> "How did the polygraph guy make you feel?"
> Answer: "Somewhat comfortable at first, considering I was anxious.  He made it sound like he was there for me.  He was not with the FBI.  He was there to help me.  Then after we went back to the room, he became a different person, and he started pressuring me.  At one point, he even grabbed my knee."
> Two of six.  Question: "Did you feel like you were pushed into admitting something?"
> Answer.  "Yes, definitely."
> Third question: "Did you feel like you had no further choice other than to admit something?"
> Answer: "Yes. Definitely.  I felt like if I don't admit, he's going to cuff me and take me to prison right now."
> Fourth question: "Did you feel like he wouldn't—would not stop questioning you until you admitted something?"
> Answer: "Oh, yes.  He just kept pushing and pushing."
> Question 5 actually has three parts.  First part: "Do you recall the polygraph guy telling you that he was there to help you?"
> Answer: "Yes."
> Second part of Question 5: "Do you recall him telling you this is your golden opportunity?"
> Answer: "Yes."
> Third part of Question 5: "Did that make you feel that you would get some benefit if you admitted something?"
> Answer: "Yes."
> Question 6 is the last one with two parts.  Part one: "Do you remember the polygraph guy bringing up your own daughters?"
> Answer: "Yes."
> Second part of Question 6: "Did that contribute to you admitting something?"
> Answer: "Yes.  He said something like, 'If this was your daughters, wouldn't you—something.'"

Doc. 60 at 151–53.  Counsel then submitted a letter explaining the absence of the questions from the report. Doc. 57.  How and when the questions were disclosed make no difference regarding the admissibility of DeClue's testimony.

untrustworthy. Doc. 62 at 19–25. Sharkey objected to the report and recommendations. Doc. 70. After conducting a de novo review, this Court now adopts with slightly different reasoning Judge Moreno's report and recommendation, Doc. 62, and overrules Sharkey's objections, Doc. 70.

### III.    Discussion

The objections to the report and recommendation and in turn the motion to suppress present four issues: (1) whether Sharkey was in custody during the post-polygraph interview; (2) whether the waiver of Sharkey's rights was the result of trickery; (3) whether the agents' post-waiver conduct resulted in an involuntary statement; and (4) whether DeClue is a credible expert. Judge Moreno answered all questions in the negative. Doc. 62. This Court agrees with Judge Moreno's first three conclusions, need not decide the fourth issue, therefore overrules Sharkey's objections, Doc. 70, and adopts the report and recommendation, Doc. 62.

### A.  Custody

The basic requirements of <u>Miranda</u> are well established in the United States Court of Appeals for the Eighth Circuit: "The familiar <u>Miranda</u> rule provides as a general matter that investigators must communicate warnings to a suspect before conducting a custodial interrogation." <u>United States v. Armstrong</u>, 39 F.4th 1053, 1056 (8th Cir. 2022).[3] Notably, a defendant's statements are only inadmissible under <u>Miranda</u> "if they were the product of 'custodial interrogation.'" <u>United States v. Tapia-Rodriguez</u>, 968 F.3d 891, 894 (8th Cir. 2020) (quoting

---

[3] As this Court has noted previously:

> Most anyone who has watched a police drama on television could likely name at least one of the four warnings required by <u>Miranda</u>. They are: (1) you have the right to remain silent; (2) anything you say can be used against you in a court of law; (3) you have the right to the presence of an attorney; and (4) if you cannot afford an attorney one will be appointed for you before any questioning if you so desire.

<u>United States v. Story</u>, No. 3:20-CR-30088-RAL, 2021 WL 1423378, at *3 (D.S.D. Apr. 15, 2021), <u>aff'd</u>, No. 21-2847, 2022 WL 1468782 (8th Cir. May 10, 2022).

Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  The critical inquiry in determining whether a person is in "custody" for purposes of Miranda is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." United States v. Treanton, 57 F.4th 638, 641 (8th Cir. 2023) (citation omitted).  One such consideration is "the circumstances surrounding the questioning and whether, given those circumstances, a reasonable person would have felt free to terminate the questioning and leave." United States v. Ferguson, 970 F.3d 895, 901 (8th Cir. 2020).

In other words, courts examine "the extent of the physical or psychological restraints placed on the suspect during interrogation." United States v. Laws, 819 F.3d 388, 396 (8th Cir. 2016) (cleaned up and citations omitted).  Factors considered by the Eighth Circuit include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990); Laws, 819 F.3d at 396.  These factors, though useful, are not exclusive or exhaustive and the ultimate inquiry remains whether the defendant was restrained as though under formal. United States v. Carlson, 613 F.3d 813, 817 (8th Cir. 2010); United States v. Thomas, 664 F.3d 217, 222 (8th Cir. 2011).

Focusing on the first factor, Sharkey objects to Judge Moreno's characterization that Sharkey knew he was not in custody and would not be arrested. Doc. 70 at 2; Doc. 62 at 8. Andress did not explicitly tell Sharkey he was not in custody; however, he effectively communicated the same.  When Andress was introducing himself as the polygrapher, Andress told Sharkey: "When

we're done you're walking out, I'm walking out, no matter what happens." Doc. 55 at 28. Andress repeated this to Sharkey five minutes before Sharkey made his incriminating statement. Doc. 55 at 88. Andress advised Sharkey of his rights by having him read the polygraph authorization form, which informed Sharkey that questioning was voluntary and that he was free to leave. Doc. 55 at 33. This advisement occurred about one hour and 20 minutes before the post-polygraph interview. Doc. 55 at 33, 76; see Berghuis v. Thompkins, 560 U.S. 370, 385–87 (2010) (finding no evidence of coercion or lack of understanding of Miranda rights even when the statement was given almost three hours after the initial warning). Indeed, at the end of the interview, Sharkey was not arrested and left the police station with his wife. Thus, the first and final factors weigh against a finding of custody during the post-polygraph interview.

Second, the post-polygraph interview was conducted in the larger of the two interview rooms. Sharkey was not restrained in any way and had the ability to move around the room. Sharkey also moved between rooms at the request of Andress, and the one escort between the bathroom and polygraph room seemed to be helping Sharkey navigate the station, rather than restricting Sharkey's movement. Doc. 55 at 48, 76. The doors leading into the rooms were locked. Id. at 71; Doc. 60 at 56. However, the doors remained unlocked from the inside such that Sharkey had to let Andress inside the polygraph room after Andress accidentally locked himself out. Doc. 55 at 71; Doc. 60 at 56. The second factor weighs against a finding of custody.

Next, the polygraph examination was scheduled after Lemmage asked Sharkey if he wanted to take the exam. In other words, Sharkey voluntarily acquiesced to an official request to respond to questions. Sharkey even acknowledged that he "volunteered" for the polygraph examination. Doc. 55 at 34. Sharkey objects to Judge Moreno's characterization that Sharkey was "invited" to return to the large office for the post-polygraph interview. Doc. 70 at 2; Doc. 62

at 8. When returning to the larger office, Andress stated: "Ah, we'll run back to that other room where it's a little bit comfier, all right? Grab your water and stuff if you want your belongings. If you want to head towards that room we were in, let me double check a couple of things." Doc. 55 at 76. Andress's tone was polite and congenial, but sufficiently firm to arguably be a directive rather than an invitation. However, the language "if you want," makes this more of a request than an order. Regardless, Sharkey voluntarily complied with the request to move to a post-polygraph interview, which weighs against the finding of custody.

The fourth factor of use of strong-arm tactics or deceptive stratagems does suggest possible psychological restraints. Sharkey has some college education and according to DeClue is no more suggestible than the average person. Sharkey was nervous at the time of the polygraph and had not slept well the night before. However, Sharkey's nervousness and less-than-normal amount of sleep, were not used to strong-arm Sharkey into a confession. The interview no doubt contained some coercive interrogation techniques, but the Eighth Circuit has deemed those to be "largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." Carlson, 613 F.3d at 817; United States v. LeBrun, 363 F.3d 715, 721 (8th Cir. 2004) (en banc). The tone of the interviews was generally friendly, and Sharkey was not subject to any threat of punishment, use of force, or brandishing of weapons. Andress appeared to touch Sharkey, but there is no evidence this touch was threatening or intended to intimidate. Although Andress told Sharkey three times that the polygraph was a "golden opportunity," each time he mentioned a "golden opportunity," Andress followed up with a statement to the effect of "if you pass"[4] less than a minute later. Notwithstanding that a polygraph

---

[4] At 00:02:29 Andress tells Sharkey twice the polygraph is a golden opportunity, then, at 00:03:27, states "it's something we can put on that side to say, 'Hey, you know what? Kevin cooperated.

showing deception followed by extensive questioning of Sharkey likely was an effort to secure a confession, under Eighth Circuit precedent this does not transform the setting into a custodial one. Ferguson, 970 F.3d at 901–02; United States v. Simpson, 44 F.4th 1093, 1097 (8th Cir. 2022); United States v. Hoeffener, 950 F.3d 1037, 1046 (8th Cir. 2020).  But see United States v. Black Bear, 422 F.3d 658, 664 (8th Cir. 2005) (finding a suspect to be in custody for a post-polygraph interview when "the request for the exam was not an 'optional appointment,'" the suspect was not a repeat felon, and was not familiar with FBI tactics or his rights).

Police domination can occur when police "assume control of the interrogation site and dictate the course of conduct followed by the suspect or other persons present at the scene . . . . [and] lead[] a suspect to believe that the police have taken full control of the scene." Griffin, 922 F.2d at 1352 (cleaned up and citation omitted).  The fact that, as here, an interview occurs at police station does not necessarily mean the environment is police dominated, though it does make it more likely. United States v. Ollie, 442 F.3d 1135, 1139 (8th Cir. 2006); United States v. Galceran, 301 F.3d 927, 930–31 (8th Cir. 2002) (per curiam).  Andress is bigger than Sharkey, as is Lemmage.  Both officers were in plain clothes.  The interview was conducted in two separate office spaces, not holding cells.  The post-polygraph interview lasted just over an hour and the entire interaction lasted nearly three hours.  Despite characteristics suggestive of police domination, these circumstances are similar to what the Eighth Circuit has found to be not police dominated.  See Galceran, 301 F.3d at 930–31 (finding a ninety-eight-minute interview in windowless conference room—as opposed to holding cell—by two officers was not police dominated); United States v. Brave Heart, 397 F.3d 1035, 1040 (8th Cir. 2005) (finding a 112

He passed the polygraph.'" Doc. 55 at 27–28.  Later, at 00:5:00, Andress states: "this is a golden opportunity for you to, you know, put this on, your side saying, 'Hey, I passed.'" Id. at 29.

minute interview with two officers described by suspect as "polite and respectful" in a large room in a police station "belies" the "label 'police dominated.'").

Sharkey was given a Miranda warning, was told "no matter what happen[ed]" he was leaving the police station that night, and was free to move about the station and the interview room. Sharkey described the situation as one he "volunteered" for and, after being informed that he could stop questioning at any time, returned to the first room when requested to do so. Shortly after Sharkey finally said he wanted to go home, questioning ceased and Sharkey left. Sharkey was not arrested until months later. Weighing the facts and circumstances of the questioning, it is unlikely that a reasonable person would have believed they were in custody notwithstanding the interrogation techniques by Andress and, to a lesser extent, Lemmage at the police station.

## B. Waiver of Rights

There are "two distinct dimensions" considered when determining whether a waiver of one's Miranda rights was done knowingly, intelligently, and voluntarily.[5]   United States v. Rooney, 63 F.4th 1160, 1168 (8th Cir. 2023); United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011); Moran, 475 U.S. at 421.   To be valid, a waiver, first, "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and, second, must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Vinton, 631 F.3d at 483 (cleaned up and citations omitted).   A court considers the totality of the circumstances when determining whether a suspect's waiver is valid. Rooney, 63 F.4th at 1168.

---

[5] Because Sharkey was not in custody at the time of his interview, there was no requirement that Sharkey be informed of his Miranda rights. United States v. Czichrray, 378 F.3d 822, 830 (8th Cir. 2004) (concluding that the suspect "was not the subject of custodial interrogation, and that the warnings set forth in Miranda were not required.").

When considering the totality of the circumstances, courts can consider whether the suspect has experience with law enforcement, his mental state and capabilities, whether he understood the language of questioning, and whether he ever indicated he understood the rights. Id. A significant factor is whether the suspect signed a Miranda waiver form, as that "fact alone carries significant weight in determining whether his waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citation omitted). Courts should also consider "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." United States v. Magallon, 984 F.3d 1263, 1284 (8th Cir. 2021) (citation omitted). Essentially, "a waiver is involuntary if under the totality of the circumstances the defendant's will was overborne." United States v. Harper, 466 F.3d 634, 643 (8th Cir. 2006) (cleaned up and citation omitted).

> Tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices, do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.

Magallon, 984 F.3d at 1284 (cleaned up and citation omitted).

The entire interaction on March 16, 2022, lasted under three hours with the challenged post-polygraph interview lasting just shy of 64 minutes. Sharkey disclosed to Andress that he was nervous and had not slept well the night before. Sharkey has limited experience with law enforcement, with the only prior conviction being one for a driving under the influence. Doc. 5. There is no evidence that Sharkey had a mental defect, vulnerability, or impairment at the time of the interview; even his expert characterized him as being about as suggestible as the average person. Doc. 56 at 3. Sharkey speaks and can understand English and gave no indication he could not understand the questions. Although Sharkey characterized part of the polygraph examination

as a "brainteaser," he said nothing about the questions during the post-polygraph interview. Sharkey read and signed the polygraph authorization form acknowledging that he was free to leave or stop the interview at any time, that he had the right to remain silent, that anything he said could be used as evidence against him, that he had the right to an attorney, and that he could have an attorney appointed for him. Doc. 55 at 24. Sharkey also showed he understood his rights when he asked to stop the interview and demonstrated an ability to push back against questioning by the agents when he told Andress to "stop doing that to me" in response to Andress asking "You're sure?" Doc. 55 at 112. These facts weigh in favor of the waiver being knowingly and intelligently made.

Sharkey argues he did not voluntarily waive his rights because he was tricked into doing so by Andress. Doc. 70 at 4–6. Specifically, Sharkey argues that Andress was deceptive in calling the polygraph a "golden opportunity" because Andress did not immediately follow the statement with "if you pass." Doc. 70 at 5. Regardless, within a minute of each "golden opportunity" statement, Andress did say words to the effect of "if you pass." Sharkey understood the general principle that passing the polygraph provided a good chance to show his innocence, though he may not have thought through that detection of deception on the polygraph could lead to an interrogation. Sharkey also argues that because Andress did not warn him of the post-polygraph interview, he was deceived into waiving his rights. Doc. 70 at 6. However, Sharkey knew that he would be explaining "his side of the story" during the interrogation. See Spring, 479 U.S. at 576 ("This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of Miranda rights, and we expressly decline so to hold today."). Sharkey understood he could terminate the interview at any time and knew the process could take multiple hours. Neither the "golden opportunity"

18

statements nor the failure to give a detailed overview of the interview process was deceptive or coercive to the extent required to overbear Sharkey's will.

Sharkey also argues that Andress's statement "I'm here for you" was meant to trick or coerce him into a waiver. Andress said "I'm here for you" several times throughout the interview, including twice before Sharkey waived his rights. Doc. 70 at 6. Only one of those two instances merit discussion: "So my job, Kevin, is a polygrapher, okay? I don't have anything, I don't work for the FBI. I'm here for you. This is a golden opportunity for you. They asked me. I'm a little out of my normal territory." Doc. 55 at 27. This also leads into Sharkey's argument that because Andress did not say he was a law enforcement agent after saying he was not FBI, Sharkey was deceived into waiving his rights. Doc. 70 at 5.

Based on the record, Sharkey could have easily inferred that Andress was with law enforcement. The form Sharkey signed is a law enforcement agency's form, complete with the DCI watermark featuring a law enforcement badge. Andress described the law enforcement agency's form as his form, required by his "department." See Doc. 55 at 28 ("We've got some forms to go over before we start. . . . My, my department, uh, has me do those."); Doc. 55 at 32 ("I do have a form for you."). The form also clearly marks the polygrapher as "SA Elbert Andress," though SA is never defined for Sharkey. Andress disclosed to Sharkey that he works with the FBI and has worked with Lemmage before. However, Sharkey's comment that Andress "should work for the FBI" at the end of the post-polygraph interview suggests that Sharkey, may have believed Andress was just a polygrapher.

Even so, Andress's failure to clarify that he was a DCI special agent did not result in overbearing Sharkey's will. While an interrogator's "'deliberate or reckless' withholding of information is objectionable as a matter of ethics, such conduct is only relevant to the constitutional

19

validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Moran, 475 U.S. at 423–24. Regardless of Sharkey's belief of Andress's job status, Sharkey knew and was told that Andress worked with the FBI and with Lemmage in the past, that anything he told Andress could and would be used against him as evidence, and that the interview would be shared with the FBI. Even if he honestly believed Andress was not law enforcement, "[t]here is no empirical basis for the assumption that a suspect speaking to those whom he assumes are not officers will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess." Illinois v. Perkins, 496 U.S. 292, 296–97 (1990). Finally and importantly, Sharkey was not in custody. Thus, under the totality of the circumstances, Sharkey's waiver was voluntary and not induced by trickery.

## C. Voluntariness

Sharkey finally argues that even if he waived his rights, Andress subsequently overbore his will through continued trickery and emotional ploys, thus making his statements involuntary. Doc. 70 at 7–10. An involuntary statement may be suppressed even if its not the result of custodial interrogation. United States v. Mattox, 27 F.4th 668, 674 (8th Cir. 2022); Brave Heart, 397 F.3d at 1040. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Vega, 676 F.3d 708, 718 (8th Cir. 2012) (cleaned up and citation omitted). "We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure." Brave Heart, 397 F.3d at 1040. The burden of showing the statements are voluntary falls onto the government.

Mattox, 27 F.4th at 675; Vega, 676 F.3d at 718 ("The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary.").

There is no evidence of, and Sharkey does not argue, that his confession was coerced through violence or promises. Instead, Sharkey argues that Andress exerted so much pressure through psychological tactics, primarily playing on his emotions, that the statement was involuntary. Sharkey contends that Andress rendered any confession involuntary by failing to tell tell Sharkey he was law enforcement, referring to the the polygraph as a "golden opportunity," and saying that he was "here for" Sharkey. For the same reasons discussed above, the failure to explicitly inform Sharkey that Andress was law enforcement and the statements regarding a "golden opportunity" did not overbear Sharkey's will under a totality of the circumstances.

Andress did state, however, that he was "here for" Sharkey four additional times after the two incidents mentioned above. Doc. 55 at 35, 70, 85, 94. Three of the four are largely inconsequential, having occurred before the challenged post-polygraph interview and in the context of getting good readings on the polygraph and Andress having traveled to conduct the polygraph of Sharkey. Id. at 35, 70, 94. However, one such reference was quite different with Andress telling Sharkey:

> I've got no skin in the game in this case, okay? I'm here, you know I came down here to, to, to you know, get, let you take a polygraph so we could put that on your side to help you out, okay, but when I get done and it's saying that, no, something happened, okay? I'm still here for you. I want to get your side of the story out because, I'm not saying that her story is one hundred percent accurate, but I know yours isn't, okay?

Doc. 55 at 85. Along the same lines as Andress's reassurances that he was there for Sharkey, Andress also made other emotional pleas, reminding Sharkey of his own daughters and relaying

the negative impact of sexual abuse on victims. Finally, Andress told Sharkey that his body showed he was being dishonest and repeatedly encouraged Sharkey to tell the truth.

These emotional pleas and reassurances, however, are not enough to render Sharkey's statements involuntary. In United States v. Brave Heart, the Eighth Circuit found a confession was not coerced when agents used similar emotional tactics. 397 F.3d at 1039–41. In Brave Heart, a case charging the murder of an infant, the interrogating agent sympathized with the "stress and pressure" that came from being a parent and indicated "that he did not think it was fair that Brave Heart's son would bear the burden of thinking that he was responsible for [the infant nephew's] death." Id. at 1037. The agent also mentioned the burden Brave Heart must be carrying, that a confession would make Brave Heart feel better, and encouraged Brave Heart to tell the truth saying that the agent "needed to know." Id. The Eighth Circuit found, despite the use of these tactics and the fact that Brave Heart was a relatively young man who did not finish high school, that the confession was voluntary because "his conscience prevailed upon him to do so, not because the environment and nature of the questioning was so coercive that it overbore his will and critically impaired his capacity for self-determination." Id. at 1041.

The emotional tactic of comparing Sharkey's children to the alleged victim is no more coercive than telling a father that his son would feel responsible for the death of a cousin. Similarly, the statement that Andress was "here for" Sharkey, is no more compelling than the statements made by the agent in Brave Heart sympathizing with the suspect. The totality of the circumstances of Sharkey's interview show that, much like Brave Heart, the confession was not the result of coercion or deception. The sympathizing or reassuring statements probably were designed to make Sharkey comfortable with Andress to facilitate a possible confession, but "[t]here is nothing inherently wrong with efforts to create a favorable climate for confession."

22

Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (cleaned up and citation omitted). Finally, the statement that Sharkey's body was "giving [him] up" is no different than an agent saying they disbelieve a suspect's denial, which has long been permissible. See Jenner, 982 F.2d at 334; Brave Heart, 397 F.3d at 1041.

Although Andress and Lemmage used interrogation tactics to get a confession from Sharkey, they were not coercive and did not overbear Sharkey's will. There is no evidence that Sharkey had a mental defect, vulnerability, or impairment at the time of the interview and Sharkey had completed at least some college. At the time of the interview, Sharkey was 45 years old with a high school diploma and some vocational training. Sharkey speaks and understands English, and gave no indication he could not understand the post-polygraph interview questions. Sharkey, though admitting to slightly inserting his finger into the alleged victim's vagina, steadfastly and consistently denied the other allegations of oral sex, displaying pornography to the children, and other incidents of touching, as well as the existence of any other victims. Sharkey also asked to go home and told Andress to stop asking him if he was sure, showing that his will was not overborne. Thus, under the totality of the circumstances, Sharkey's non-custodial statements were voluntary.

### D. Expert Credibility

In his Report and Recommendation, Judge Moreno found DeClue's testimony to be untrustworthy, largely irrelevant, and unconvincing. To the issue of suppression, DeClue's report is largely irrelevant as it goes to the weight of the evidence if admitted rather than whether it was obtained in violation of Sharkey's rights. Specifically, DeClue points to evidence that fails to corroborate Sharkey's confession, including the sleeping arrangements and practices of the children. Doc. 56 at 11. DeClue also opines that Sharkey's confession might be a fabricated

memory fragment and thus a false confession. Doc. 56 at 10, 16–19. Regardless of DeClue's opinions, Sharkey was not in custody, though he nevertheless received and waived <u>Miranda</u> rights and made voluntary statements. Some of DeClue's critiques go to the weight to afford Sharkey's confession and not its admissibility. See <u>United States v. Anaya</u>, 715 F. Supp. 2d 916, 954 (D.S.D. 2010).

Additionally, DeClue admitted to making incorrect assumptions in his report, namely that the polygraph was a "sham" because Andress did not properly calibrate his machine nor score the exam. Doc. 56 at 12; Doc. 60 at 160–61. However, as explained in Andress's testimony at the hearing, the polygraph machine did not need to be calibrated to correctly determine if a truth or lie was being told, instead, the equipment only needed to show it received good readings on Sharkey. Doc. 60 at 74. Contrary to DeClue's belief, Andress scored the polygraph during breaks, rather than at the end of the polygraph. Doc. 55 at 20; Doc. 60 at 75.[6]

DeClue also opined that the failure of the agents to inform Sharkey of the prior experiences of the alleged victim coerced the confession. DeClue believed that law enforcement should have told Sharkey that the alleged victim had delayed in accusing Sharkey of sexual contact and had prior abuse experiences with other sexual perpetrators, possibly explaining familiarity with pornography and certain sex acts.[7] Doc. 56 at 15. Setting aside how odd it is to expect law

---

[6] DeClue also took issue with the fact that Andress did not tell Sharkey he scored a -23 on the exam, instead only saying he "didn't do well." Doc. 55 at 76. However, even if Sharkey had been told he scored a -23, there is no evidence Sharkey would have understood those results any other way than that he "didn't do well" on the test. The communication "didn't do well" is clear and indicated there were significant issues with the results of the exam—namely that the polygraph results showed deception by Sharkey.

[7] Sharkey seemed to have some knowledge of others' abuse of the alleged victim, saying that the alleged victim "had more drama at the other side [of the family]." Doc. 55 at 105. Sharkey also stated that the mother of the alleged victim made statements to Sharkey's wife before she passed away and that those statements made Sharkey's wife fearful of the alleged victim's father and uncles. Doc. 55 at 105.

enforcement to divulge such victim information to an accused being questioned about sexual assault, these claimed omissions have little to do with whether Sharkey was coerced into giving his statements.

DeClue opines that Andress threatened Sharkey when Andress said:

> It's, we've got her story, we've got your story, and we now have a polygraph saying that he's not being truthful.  So you don't, help me get your side of the story out, what we end up doing is we go with her side of the story because that's all we have because we know your story's not true, right?  So what we want to do is get your side of the story out.

Doc. 55 at 82.  Characterizing this interrogation technique as a "threat" ignores the tone of the interview, which was polite and matter of fact.

DeClue also opines that Andress telling Sharkey his "body was giving [him] up" was akin to saying that "his body proved he had engaged in sexual activity."  However, of the five times Andress says Sharkey's body is "giving [him] up," four reference the results of the polygraph. Doc. 55 at 82, 84, 104.  Only once does Andress say he does not need the polygraph machine to see that Sharkey is being dishonest because he is "trained to read people and how they react to things."  Doc. 55 at 84.  Regardless, police refusing to believe a suspect's denials or telling a suspect he is being dishonest in itself does not overbear the suspect's will.  Jenner, 982 at 334. This Court defers to Judge Moreno's other assessments of DeClue's credibility but need not critique his credibility to reach this result.

## IV.    Conclusion

For the reasons sated above, it is hereby,

ORDERED that the Report and Recommendation, Doc. 62, is adopted.  It is further

ORDERED that Sharkey's Motion to Suppress, Doc. 39, is denied.

DATED this 17ᵗʰ day of May, 2023.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE